# CLOUGH & MOLLOY, INC., *v.* EFFIE SHILLING.

*Workmen's Compensation—Action Against Wrongdoer—Employee's Dependents as Plaintiffs—Apportioned Verdict—Presumption of Negligence—Fall of Scantling.*

Workmen's Compensation Act, section 58, providing that where the injury or death for which compensation is payable under the act was caused "under circumstances creating a legal liability in some person other than the employer," the employer or insurer, paying the award, may enforce the liability of such other person, or, in case the employer or insurer fails to proceed within two months to enforce such liability, the injured employee, or in case of death, his dependents, may do so, does not create any new liability, but simply designates in what manner the liability theretofore existing, under the common law and Lord Campbell's Act, should be enforced, and changes the parties who might be benefited by such enforcement.          p. 195

Dependents of a deceased employee, in suing, under section 58, one responsible for the employee's death, upon the failure of the employer, when self insured, or of the insurer, to bring such suit, need not make the State the legal plaintiff, but may sue in their own names to the use of the insurer.          pp. 196, 197

In a suit, brought under section 58, by the dependents of a deceased employee, against a third person responsible for the employee's death, the jury may properly apportion the verdict among the dependents, after alloting to the insurer the amount of the award paid by the latter, thus applying by analogy the practice provided for in Code, art. 67 (Lord Campbell's Act).

pp. 197-199

When a prayer embodying a general demurrer to the evidence is offered at the close of the whole case, all plaintiff's evidence, and that part of defendant's evidence, if any, which tends to establish plaintiff's contention, must be taken to be true, together with all legal presumptions fairly deducible therefrom.

p. 199

Evidence that plaintiff's decedent was struck by a piece of scantling which fell from a scaffold, or the eaves of a building, at or near a point where defendant's employees were at work on the scaffold, that they were using in their work pieces of scantling similar to the piece which struck decedent, and that these employees of defendant were the only persons at work upon the scaffold or building near the point from which the scantling fell, *held* sufficient to raise a presumption of negligence on the part of defendant's employees, and to present a question for the jury.                                              pp. 200-207

*Decided December 4th, 1925.*

Appeal from the Superior Court of Baltimore City (FRANK, J.).

Action by Effie Shilling and others, to the use of the Indemnity Insurance Company of North America, against Clough & Molloy, Inc. From a judgment for plaintiffs, defendant appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Walter L. Clark,* for the appellants.

*Robert R. Carman,* with whom were *Franklin P. Barrett, G. C. A. Anderson,* and *Keech, Deming & Carman* on the brief, for the appellees.

DIGGES, J., delivered the opinion of the Court.

During the month of March, 1923, there was being constructed a building in Baltimore City known as the Johns Hopkins University Dormitory, the general contractor in charge of the work being Frainie Brothers & Haigley. There were a number of sub-contractors employed to do certain portions of the work going into the general construction, among whom were the Pen-Mar Company, the employer of John Edgar Shilling, which sub-contracted for the slate roof-

ing; and Clough & Molloy, Inc., the defendant below and appellant here, which was the sub-contractor doing the stone work. On the 28th day of March, 1923, John Edgar Shilling, while in the course of his employment on and around the building, was struck upon the head and killed by a falling piece of scantling 4 by 4 and 10 or 12 feet long. Shilling was the foreman in charge of the work being done by the Pen-Mar Company, and at the time of his death left surviving him a widow, Effie Shilling, and four minor children. The Pen-Mar Company, the employer of Shilling, was protected by a policy of liability insurance in the Indemnity Insurance Company of North America. Shortly after the death of her husband, Effie Shilling made application to the State Industrial Accident Commission for compensation for the death of her husband, on behalf of herself and minor children, under and in accordance with the provisions of article 101 of Bagby's Annotated Code of 1924, which article is commonly known as the Workmen's Compensation Act. On or about May 4th, 1923, the State Industrial Accident Commission awarded compensation against the Pen-Mar Company, the employer of the deceased, and the Indemnity Insurance Company of North America, the insurer, in the sum of $5,000 and $125 for funeral expenses incurred by reason of the death of Shilling, and apportioned the award among the widow and Ruth E. Shilling, Dorothy M. Shilling, John Walter Shilling and Edith May Shilling, minor children of the deceased. This compensation was being paid by the insurance company. After the lapse of two months, no action having been brought by the insurance company against Clough & Molloy, Inc., the appellant, the alleged tort-feasor, suit was instituted in the Superior Court of Baltimore City by Mrs. Effie Shilling, widow of John Edgar Shilling, deceased, individually and as next friend of Ruth E. Shilling, Dorothy M. Shilling, John Walter Shilling and Edith May Shilling, infants, in their behalf, and to the use of the Indemnity Insurance Company of North America, a body corporate, against Clough & Molloy, Inc. This case

was heard by the court and jury, and on February 16th, 1925, resulted in a verdict for the plaintiffs for the sum of $15,000, apportioned as follows: To the Indemnity Insurance Company of North America, $5,125; to Effie Shilling, widow, $5,000; to Ruth E. Shilling, infant, $500; to Dorothy M. Shilling, infant, $875; to John Walter Shilling, infant, $1,500; and to Edith May Shilling, infant, $2,000; on which day a judgment *nisi* on verdict was entered. On February 17th, 1925, defendant filed a motion for a new trial and also a motion in arrest of judgment, both of which motions were on February 21st overruled, and the judgment on verdict made absolute in favor of the plaintiffs for $15,000 apportioned as above stated. From this judgment the appellant has brought this appeal.

The record contains four exceptions, the first and second being to the ruling of the court in sustaining an objection by the plaintiff to the offer by the defendant of the report of the employer to the State Industrial Accident Commission; the third being to the ruling of the court on the prayers; and the fourth to the overruling of the defendant's motion in arrest of judgment. The first two exceptions were not pressed at the argument or in the brief of the appellant, and are practically abandoned, which makes it unnecessary for us to discuss them, further than to say that we have examined them and find no reversible error. The record presents, therefore, for our consideration two questions, the one raised by the motion in arrest of judgment being whether the plaintiffs have any right to maintain the action in its present form, and the second raised by the prayers of the defendant seeking to withdraw the case from the jury for want of sufficient evidence. Taking these up in the order named, as to the first it is contended that section 58 of article 101 of the Code, entitled "Workmen's Compensation," does not create any new cause of action; that at common law, in cases of negligence resulting in death no right of action survived to the defendants of the deceased, but that such action for personal injury ceased with the death of the injured party;

that at the present time, under the laws now in force in this state, the only right of action given in such case is by the provisions of Lord Campbell's Act, codified as article 67, and that this suit was improperly brought if attempted under the authority of Lord Campbell's Act, for the reason that that article specifically provides, by section 2, that the action must be brought in the name of the State of Maryland for the use of the persons designated in the article. We do not think that this contention is sound.

Article 101, "Workmen's Compensation," originally enacted by chapter 800 of the Acts of the General Assembly of Maryland, 1914, in its preamble states: "The State of Maryland, exercising herein its police and sovereign power, declares that all phases of extra-hazardous employments be and they are hereby withdrawn from private controversy, and sure and certain relief for workmen injured in extra-hazardous employments and their families and dependents are hereby provided for, regardless of questions of fault and to the exclusion of every other remedy except as provided in this act." And by section 60 of the said act, now codified as section 63 of article 101, it is provided: "The rule that statutes in derogation of the common law are to be strictly construed shall have no application to this article; but this article shall be so interpreted and construed as to effectuate its general purpose."

Bearing in mind the purpose of the Workmen's Compensation Law and the rule of construction to be applied thereto, we will now examine the provisions of article 101 by virtue of which the case now before us was instituted, and which are contained in section 58 of article 101, Bagby's Code of 1924. This section provides: "Where injury or death for which compensation is payable under this article, was caused under circumstances creating a legal liability in some person other than the employer to pay damages in respect thereof, the employee, or in the case of death, his personal representatives or dependents as hereinbefore defined, may proceed

either by law against that other person to recover damages
or against the employer for compensation under this article,
or in case of joint tort-feasors against both; and if compensa-
tion is claimed and awarded or paid under this article, any
employer, if he is self-insured, insurance company, association
or the State Accident Fund, may enforce for their benefit,
as the case may, the liability of such other person; provided,
however, if damages are recovered in excess of the compensa-
tion already paid or awarded to be paid under this article,
and also any payments made for medical or surgical services,
funeral expenses or for any of the other purposes enumerated
in section 37 of this article, then any such excess shall be
paid to the injured employee, or in case of death to his
dependents less the expenses and costs of action incurred by
the employer, insurance company, association or State Acci-
dent Fund as the case may be. If any such employer, insur-
ance company, association or State Accident Fund shall not,
within two months from the passage of the award of this
commission, start proceedings to enforce the liability of such
other person, the injured employee, or in case of death, his
dependents, may enforce the liability of such other person,
provided, however, that if damages are recovered the injured
employee or in case of death his dependents may first retain
therefrom the expenses and costs of action for which the em-
ployer, insurance company, association or the State Accident
Fund, as the case may be, shall be reimbursed for the com-
pensation already paid or awarded and any amount or
amounts paid for medical or surgical services, funeral ex-
penses or for any of the other purposes enumerated in sec-
tion 37 of this article, and the balance in excess of these
items shall enure to the injured employee, or in case of death,
to his dependents, and the amount thus received by the in-
jured employee or in case of death by his dependents shall
be in lieu of any award that might otherwise have been made
thereafter in the same case under the provisions of this
article and said case shall thereupon be deemed to have been
finally settled and closed."

It will be seen that where injury or death for which compensation is payable under this act was caused under circumstances creating a legal liability in some person other than the employer to pay damages in respect therefor, the section gives to the parties specifically designated therein, under the conditions therein set forth, a right of action against a third party, the tort-feasor. The clear meaning of the language, "under circumstances creating a legal liability in some person other than the employer," is that the circumstances under which the injury was received created a liability resting upon the tort-feasor outside of the provisions of section 58, which means that if the injury did not result in death the injured party would have had a right of action at common law against the wrongdoer for such injuries, or in case injury resulted in death, that the dependents would have had a right of action by reason of the liability then existing under Lord Campbell's Act. In other words, section 58 of article 101 does not create any new liability, but simply designates in what manner the liability theretofore existing, under the common law and Lord Campbell's Act, should be enforced, and changes the parties who might be benefited by such enforcement. Section 58 provides, in cases where there was an existing liability on the part of a third person, other than the employer, that in case of death the dependents, as defined in article 101, may proceed either by law against the tort-feasor or against the employer for compensation under the act, and that if they elect to proceed under the act and compensation is awarded against an employer, where he is self-insured, or against the insurer, the employer in such case, or the insurer, may bring an action to enforce for their benefit the liability of the tort-feasor, and that if the employer who is self-insured, or the insurer, fails to start proceedings to enforce the liability of the tort-feasor within two months from the date of the award of the Industrial Accident Commission, the injured employee, or his dependents in case of death, may enforce the liability of such wrongdoer, with the proviso that if damages are recovered the party bringing suit shall

first retain the expenses and costs of action, after which the employer or insurer shall be reimbursed for the compensation awarded, and the balance in excess of said award, and the cost of medical services and funeral expenses, shall enure to the injured employee, or his dependents when the injury has caused death. The section further provides that such recovery "shall be in lieu of any award that might otherwise have been made thereafter in the same case under the provisions of this act, and said case shall thereupon be deemed to have been finally settled and closed."

The forms of the titling in cases of this character which have heretofore been brought to this Court do not appear to be uniform. In *"State, to the use of the State Accident Fund v. New York, P. & N. R. R. Co.,"* 141 Md. 305, the suit was brought in the name of the State for the use of the State Accident Fund, which was the insurer, and the widow of the deceased, who was the sole dependent. In that case we said, speaking through Judge Urner: "As the State Accident Fund consists of liability insurance premiums paid to the State treasury and administered by State officials, it is proper that a suit for the benefit of the fund under the act should be brought in the name of the State, and as the widow has a contingent interest in the recovery and could have proceeded in her own right against the defendant if the State Accident Fund had not sued, we see no reason to hold that it was improper to name her as one of the parties for whose use the action was instituted."

In *Kaufman Beef Co. v. United Railways and Electric Co.,* 135 Md. 524, the action was brought by the employer in his own name for the use of the insurer and not in the name of the State of Maryland. This case was instituted under section 57, chapter 800 of the Acts of 1914, as it read before the amendments made by the Acts of 1920 and 1922. The dependents, before these amendments, were given their election either to proceed against the wrong-doer or to accept compensation, but they could not do both; if they elected to accept compensation, the employer, his insurer, or the State

Accident Fund, could proceed against the wrong-doer. The suit having been brought by the employer, similar objections to those raised in this case were made on appeal, and the same arguments were contained in the briefs. In that case it was contended that the suit should have been brought in the name of the State. This Court held: "Compensation having been awarded to the dependents of the deceased employee by the State Industrial Accident Commission, the pending subrogation suit, as permitted by statute (Code, art. 101, sec. 58), was brought by the appellant, as employer, against the United Railways and Electric Company and the Curtis Publishing Company, the latter corporation being the publisher of the papers which figured in the accident." It will be seen from the above quotation that recovery was allowed by the employer in his own name for the use of the insurer, he being subrogated to the right of action given by the statute to the dependents. If, as was held in that case, the employer could, under the provisions of section 58, maintain an action in his name for the use of the insurance company without resorting to the State of Maryland as the legal plaintiff, we see no sound reason why the person to whose rights he was subrogated could not maintain a similar action without making the State of Maryland the legal plaintiff.

In *Bethlehem Steel Co. v. Raymond Concrete Pile Co.,* 141 Md. 67, decided by this Court prior to the enactment of chapter 303 of the Acts of 1922, which act amended section 58 so as to permit the dependents to sue the wrong-doer in event the employer or insurer did not proceed to enforce the liability within two months after the award of compensation, the suit was brought in the name of the employer for the use of the insurer and the dependents of the deceased, and while the judgment was reversed, this was done on grounds other than the titling. It may be also noted that in the case last referred to, the verdict of the jury for $30,-000 was an apportioned verdict, disregarding the insurer against whom compensation had been awarded, and giving the full amount of the verdict in various portions to the

dependents of the decedent; and in passing upon this phase of the case, which is also raised in the present case by the motion in arrest of judgment, we said, speaking through Judge Boyd, at page 88: "Then when we come to the second prayer, it is like one in a suit brought under Lord Campbell's Act, and as a result the verdict of the jury was not for what the plaintiff or the insurer had a right to recover, and then any excess for the dependents, but wholly and only for the damages sustained by the dependents for the death of Graffius—the whole amount being apportioned between the widow and children and judgment entered accordingly. It may be said that the defendant cannot complain of that, but it certainly has a right to complain of a verdict for $30,000 in favor of a widow and children when, under no circumstances, were they entitled to more than the excess over the award and the employer's expenses and costs of action." It will be seen that this Court did not condemn the form of the verdict because it was an apportioned verdict, but because in the apportionment the whole amount of the verdict was apportioned to the dependents of the deceased, without regard to the insurer against whom compensation had been awarded; and it was held that a verdict making such an apportionment was invalid for the reason that the dependents, under the provisions of the statute as it then stood, in no event were entitled to more than the balance remaining after the insurer was reimbursed for the amounts paid by it under the award, and costs and expenses. In the present case the apportioned verdict is not open to the objection presented in that case, for the reason that under the granted instructions contained in the plaintiff's second prayer the jury were directed that if they found for the plaintiffs they should allot to the equitable plaintiff the amount of the award against it by the State Industrial Accident Commission, and that the excess, if any, should be apportioned between the widow and infant children, the dependents of the deceased. While it is true that this verdict is in the form provided by Lord Campbell's Act, it is also true

that under the provisions of section 50 of article 101, the Commission may apportion the benefits among the dependents in such manner as it may deem just and equitable; and we can discover no legal impediment or impropriety, in a case such as we are now considering, in the jury, under proper instructions, apportioning their verdict among the dependents. While it may be contended that the proper method of instituting suits of this character is to bring the suit in the name of the State of Maryland as the legal plaintiff, for the use of the various parties entitled, it will be seen from what has been said that we do not think this is essential; and that there is no fatal error in the titling of the suit or the form of the verdict. We see no objection to the enforcement of an existing legal liability by the parties designated in article 101, section 58, in the manner done in this case, nor in applying by analogy the forms of practice provided for in article 67 (Lord Campbell's Act), when these forms are useful and applicable in giving effect to the clear purpose and intention of the Workmen's Compensation Law.

The remaining question to be considered is raised by the refusal of the lower court to grant the defendant's first prayer, which was a general demurrer to the evidence and sought to have the case withdrawn by directed verdict for the defendant. When this form of prayer is offered at the close of the whole case, the established rule, frequently stated and applied by this Court, is that all of the plaintiff's evidence and that part of the defendant's evidence, if any, which tends to establish the plaintiff's contention, must be taken to be true, together with all legal presumptions fairly deducible therefrom. Applying this rule to the present case, if the whole evidence adduced on behalf of the plaintiff and the legal presumptions fairly deducible therefrom would entitle the plaintiff to recover, the defendant's first prayer was properly refused. In reaching a decision on this point it is necessary for us to examine the plaintiff's evidence without regard to that of the defendant, except in so far as it

might support the contention of the plaintiff. To this end we will look at the plaintiff's evidence as shown by the record, which may be summarized as follows:

That during the month of March, 1923, there was being erected a building known as the Johns Hopkins University Dormitory, in the City of Baltimore, by Frainie Brothers & Haigley, as general contractors; that a number of sub-contractors were engaged in various parts of the construction; that among them was the Pen-Mar Company, by which John Edgar Shilling was employed as foreman, engaged in laying the slate roof upon the building; that there had been erected by the general contractor a scaffold extending along the south side of the south wing of the building, the footboards of which were near the eaves of the buildings; that this scaffold had been used by the various subcontractors in their operations upon the building; that on March 28, 1923, about 2.30 p. m., the deceased, John Edgar Shilling, while in the course of his employment, was walking along a pathway slightly to the south of the south side of the scaffold, and a piece of scantling, 4 by 4 by 10, fell from above him, striking him upon the head and resulting in his death; that at the time the scantling fell no employee of the Pen-Mar Company was upon the scaffold, and that those persons who were upon the scaffold, or in the immediate vicinity of the place from which the scantling fell, were three of the employees of the appellant (defendant below), Clough & Molloy, Inc., one of the subcontractors, engaged in doing the stone work upon the building; that two of these employees were upon the scaffold, one of them, Blowers, being at the western end of the scaffold, near the offset, in the south wing of the building, and the other, Leaman, within a few feet of a point on the scaffold directly above the deceased at the time he was killed; that the third employee of the defendant, Brooks, at the time of the accident was engaged in clearing off a platform around the chimney, preparatory to putting on the capstone; that it was necessary for the scaffold, which had been erected by the general contractor, to be increased in height by the

defendant for the purpose of placing this capstone on the
chimney; that at the time of the accident Leaman and Blow-
ers were engaged in making an upward extension to the
scaffold, this extension being constructed of pieces of scant-
ling 4 by 4 and of similar length to that which caused the
death of Shilling; that about 30 minutes before the accident,
other employees of the defendant were engaged in sending
up to Leaman pieces of scantling 4 by 4; that the plaintiff's
witness McGregor, an employee of the Pen-Mar Company,
testified: "On the day of the accident, about 2.30 o'clock,
we were making brackets for the scaffolding, to go up on top
of the building, and were working on the south wing on the
south side, about 8 or 10 feet from the building, and 40 or
50 feet from the southwest corner. Between us and the
building was a shanty. I noticed a man working on the
scaffold on the south side of the building. He was working
for the stone mason, and was the only one on top. He had
two men down on the ground sending up four by fours to
him. I heard him holler down, 'Send up a couple of four
by fours,' and I saw them pull them up, and lay them on
the scaffolding. Ten or fifteen minutes before that, Mr.
Shilling was around talking to us, and in ten or fifteen min-
utes he came back again. I saw him walking toward me, and
when I looked again I saw him holding his head, and then
he fell over, and I saw this gentleman come down. I saw
a four by four, ten feet long, laying alongside of him, with
blood on it. The man on the scaffold came right down to
us and said, 'Oh, Mac, oh, my God, I wish it was me!' He
came down in about five minutes, right straight down."

The plaintiff's witness Wilson, another employee of the
Pen-Mar Company, testified: "I was working on the Johns
Hopkins University building under my foreman, Mr. Shill-
ing. The scaffolding was built when we came on the job.
On the day of the accident I was working on the ground at
the south end of the building, with Mr. Guy and Mr. Mc-
Gregor. We were making brackets, and were about 9 or 10
feet from the edge of the building. I saw one man working

on the scaffolding. I do not know his name. I think he was working for Clough & Molloy. He was nailing some boards on the scaffolding, and seemed to be kneeling down when I saw him. The first time I saw him was when I was coming around the side of the building to get some brackets. He was on the scaffold, and two men were on the ground, and he was pulling up a piece of timber 4 by 4, 10½ or 12 feet long, with a ¾-inch rope. I saw them pull it up and lay it on the eaves of the building. Then I got an armful of brackets and went to the north side of the building, and came back for more brackets. Mr. Shilling followed me around, 25 or 30 feet behind me. As I walked to where Guy and McGregor were making brackets, something attracted my attention, and I turned around and saw Mr. Shilling lying on the ground. * * * I did not see the piece of timber hit him, but did see a piece of 4 by 4, between 10 and 12 feet long, laying on the side of him, with blood on the edge. When I walked around the building just ahead of Mr. Shilling, I did not see any scantling 4 by 4, 10 to 12 feet long on the ground. When I got to where they were making brackets, and something attracted my attention, I looked around, and Shilling was lying three to five feet east of where the chimney was, where the man was on top of the scaffolding. The man that was working on the scaffolding was three to five feet west of the man lying on the ground. The man working on the scaffold was Leaman. Shilling was following me about 25 or 30 feet."

The plaintiff's witness Frank Schmick, also an employee of the Pen-Mar Company, testified as follows: "I was on the job about 2.30 that afternoon, and saw the Clough & Molloy men working on the south side. They were rigging the scaffold up to put caps on the chimneys. * * * They were to put up a derrick to pull up the stone, and when I left that side there was one man working there. He had built one upright, and when I left that side he was building another. They started the scaffolding around 11 o'clock in the morning. It was built on the extension of the old scaffolding.

They make the uprights out of scantling, 4 by 4, or 3 by 4, some run 16, 18, or some 10 feet. When I last saw the scaffolding before the accident, they were still building this scaffolding—that was around 11 o'clock in the morning, when they started it. * * *

"Q. What time was it you say the work was going on just prior to his death? A. I judge about ten minutes. Q. Three or four minutes before he was killed you think they were working on the extension? A. Yes, sir. * * * When I left that side there was a rope hanging down from the scaffolding, about three or four minutes when I left that side. McGregor ran around and said, 'My God, Shilling is dead,' and I ran around there, and everybody was excited. When I came around this side the first man I saw on the scaffolding was John Leaman, who was working for Clough & Molloy. Shilling was lying on the ground right on the path. I didn't see any one else on the scaffolding. The scantling was lying underneath the scaffolding, and was either a 3 by 4, or 4 by 4. I shoved it underneath the shanty. It was 10 feet long. The scaffolding ran up to this chimney. Mr. Shilling was lying about 8 or 10 feet west of the west end of the shanty. The chimney was about 8 or 10 feet back on a line west of the west end of the shanty. The first thing I looked up and I seen Mr. Leaman on the scaffold with one upright and with two cleats, and he was putting another upright up, and I said, 'What are you being worried about?' * * * Q. You say you were there just about three minutes prior to the accident or thereabouts, and you saw two uprights put up? A. I saw one upright, had cleats on it, and they put one they had cleats on it to put up another one with. Q. After you went around you saw Mr. Leaman here. Did you look to see how many uprights were there then? A. That is when I saw the uprights up. When I went around there the first thing I looked, I saw the upright and the cleats on the other one. I did not take notice how many uprights were up just before Mr. Shilling's death."

This testimony tends to prove the following facts: That

employees of the defendant were working upon the scaffold at the time of the accident which caused Shilling's death; that they were using in their work pieces of scantling 4 by 4, of different lengths, from 10 to 18 feet; that at least three pieces of such scantling were pulled up by Leaman to the scaffold, two of which were seen by McGregor to be pulled up and laid on the scaffold, and one by the witness Wilson being pulled up and laid on the eaves; that Shilling's death was the result of being struck by a falling piece of scantling 4 by 4, about 10 feet long, which came from above him and in the direction of the place where the defendant's employees were at work. From these proven facts, under the authorities in this state and elsewhere, there arose a legal presumption that the falling of the scantling which caused the death of Shilling was due to the negligence of the defendant's employees, either in negligently doing an act which a reasonably prudent man would not have done, or omitting to do an act which an ordinarily prudent and cautious person would have done, under similar circumstances. In the case of *Howser v. Cumb. & P. R. R. Co.,* 80 Md. 146, we said: "Whilst the general rule undoubtedly is, that the burden of proof that the injury resulted from negligence on the part of the defendant, is upon the plaintiff, yet in some cases, the very nature of the action may, of itself, and through the presumption it carries, supply the requisite proof. *Wharton on Negligence,* par. 421. Thus when the circumstances are, as in this case, of such a nature that it may be fairly inferred from them that the reasonable probability is that the accident was occasioned by the failure of the appellee to exercise proper caution which it readily could and should have done; and in the absence of a satisfactory explanation on the part of the appellee, a presumption of negligence arises against it." The court in that case then quotes with approval the English cases of *Byrne v. Boadle,* 2 H. & C. 722, and *Scott v. London Dock Co.,* 3 H. & C. 596. In the latter case the court said: "There must be reasonable evidence of negligence. But where the thing is shown to be under the man-

agement of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care." The court in the case in 80 Md., *supra,* applied the doctrine of *res ipsa loquitur,* and quoted with approval, in addition to those above cited, English and American authorities in support of that doctrine, in a number of which cases the facts were analogous to the case now under consideration.

In *Strasburger v. Vogel,* 103 Md. at page 91, this Court, speaking through Judge McSherry, in holding that a prayer granted by the lower court submitting that case to the jury had ignored certain evidence offered by the plaintiff, which evidence, if considered, would have presented facts shown by the plaintiff which would have accounted for the accident independently of the negligence of the defendant, said : "The instruction deliberately ignored the fact which the plaintiff had proved that an independent agency had intervened and had caused the bricks to fall, and permitted a recovery upon an inference of negligence arising solely from the mere fact that the bricks fell, unless the defendant satisfied the jury that the falling of the bricks was not caused by his negligence. If the plaintiff's case had rested exclusively upon an inference of negligence deduced from the single fact that the bricks fell without an apparent or assigned cause; and if the defendant had, by way of answer to that theory, relied upon the intervention of an independent agency, the instruction would have been correct, because the presumption of negligence arising from an unexplained falling of the bricks would have established a *prima facie* case which the defendant could only have rebutted by showing a state of facts which destroyed or negatived that presumption.   Between the two conflicting theories it would have been the province of the jury to pass." That was a case in which the plaintiff sought to recover for an injury caused by a brick falling from the chimney of the house of the defendant, but the plaintiff also proved by testi-

mony that at the time of the accident a number of persons were upon the roof of the defendant's house, leaning upon and in contact with the chimney, and by this evidence there was shown an independent cause of the accident for which the defendant in no way was responsible, he not having invited the people upon the roof, and they being there without his knowledge or consent. It is, however, clear from the language of that opinion that if the plaintiff had rested solely upon the testimony that the brick fell from the chimney of the defendant, with nothing further, he would have established a *prima facie* case, because the presumption of negligence arose from the unexplained falling of the brick from the premises owned and controlled by the defendant, and this presumption would have been sufficient to have submitted it to the jury.

In *Decola v. Cowan,* 102 Md. 551, the facts were that the plaintiff was injured by the falling of a brick from the wall of a building being constructed at the corner of North and Maryland Avenues, in Baltimore City; that the bricks in the wall were being laid by a subcontractor of the general contractor; that during the progress of the work the brick fell, but no witness saw from where it came, other than from the direction of the top of the wall under construction. This Court in that case again quoted with approval the two English cases hereinbefore referred to, and then said: "The fact of the accident and the resulting injury to the plaintiff were clearly proven. There was also evidence from which the jury, if they believed it, might have found that she was injured by a brick falling from the wall which was being erected under the management of the defendant or their servants. It is true no brick was followed by an eye-witness in its flight from the wall down to the head of the plaintiff who was passing underneath it, but she was struck on top of the head and the witness Ross testified that he saw the brick when it struck her." *Walter v. Baltimore Electric Co.,* 109 Md. 513, at page 526. *Chesapeake Iron Works v. Hochschild,* 119 Md. 303. *Weilbacher v. Putts,* 123 Md. 249.

Applying the rule as laid down and sustained by these authorities to the facts in the present case, we find that the deceased Shilling came to his death as a result of being struck by a piece of scantling falling from the scaffolding or eaves at or very near the point where the defendant's servants were engaged in work; that they had under their control and management a number of pieces of scantling of the same or similar description as the piece which caused the death of Shilling; that these employees of the defendant were the only ones at work upon the scaffold or building at or near the point from which the scantling fell. These facts, we think, are sufficient to raise the presumption of negligence on the part of the servants of the defendant and make such a *prima facie* case as needs to be rebutted by the defendant. This being true, it presented a jury question, and the court below made no error in refusing the prayer of the defendant which sought to withdraw the case from the jury's consideration. This disposes of the two points raised and pressed by the appellant on this appeal and it is unnecessary for us to say anything further than that, in our opinion, the granted prayers of the plaintiff and defendant presented the case fully and fairly to the jury and in an aspect as favorable to the defendant as it was entitled to.

*Judgment affirmed, with costs to the appellee.*