HARFORD ETC. *v.* LLOYD E. MITCHELL, INC.

[No. 249, September Term, 1972.]

*Decided May 17, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Eugene A. Alexander, III* and *Sidney Blum*, with whom were *Eugene A. Edgett, Jr.*, and *George W. Elder* on the brief, for appellant.

*Robert J. Ryan*, with whom were *A. Owen Hennegan* and *Moore, Hennegan, Brannan & Carney* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The trial judge, Dyer, J., relying upon *Combustion Engineering Co. v. Hunsberger*, 171 Md. 16, 187 A. 825 (1936), directed a verdict in favor of the appellee (Mitchell) against the appellant (Harford), plaintiff below, at the conclusion of Harford's case. We think he should have relied upon *Fields v. Reid-Hayden, Inc.*, 188 Md. 449, 53 A. 2d 24 (1947), in which we distinguished *Hunsberger* and followed *Clough & Molloy, Inc. v. Shilling*, 149 Md. 189, 131 A. 343 (1925). Had he done so we think he would have been obliged to deny Mitchell's motion, thereby shifting to it the burden of going forward with the evidence. Harford, an ironworker, was injured in the summer of 1962 but, oddly enough, there is little, if any, dispute about what happened, although why it happened continues to be an enigma.

Harford's employer, J. W. Bateson Company, Inc., (Bateson) was the general contractor for the construction of what was then known as the Murphy Home Project on West Mulberry Street in Baltimore. Mitchell was the subcontractor for the mechanical work. On 27 July Harford and fellow ironworkers Seers, Most, O'Donnell, Matthews and Schweikert were engaged in extending the height of a materials tower, the familiar hoisting device used by builders to lift men and materials to the upper floors of buildings under construction. Also they were replacing the worn cable with a new cable. At the time the only other workmen in the building were Mitchell's steamfitters who were "hanging" pipe on the sixth floor. Seers was still at the top of the tower; the others had come down. Harford sustained a glancing blow on the head by a falling "hanger" — a piece of $5/8$ inch steel rod about 18 inches long, threaded at each end, used by the steamfitters, as Most put it, to "hang their pipe off of so that you can adjust . . . [it] up and down . . . ." Mitchell's men had been working near the edge of the building directly above the spot where Harford had been standing which was 25 feet from the base of the materials tower.

The case came on for trial before Judge Dyer and a jury on 24 May 1972. The record contains the testimony of but four witnesses: Most, O'Donnell, Harford and Dr. Borkovic, the treating physician. Most said that as he descended from the

top of the tower he saw Mitchell's steamfitters installing "hangers" on the sixth floor "about two or three feet from the edge of the building." There were no other crafts in the building at the time. He identified the hanger as the object that struck Harford.

O'Donnell said he saw Mitchell's steamfitters, wearing yellow hard hats, as he came down from the top of the tower. They were "hanging pipe" on the sixth floor. He knew they were Mitchell's men "cause that's the only ones that were working there." He saw the hanger hit Harford and when he and Dutch Schweikert looked up they saw "a guy there with a yellow hat on . . . looking over the [edge of] the building . . . ."

Harford said he and Schweikert were working on the cables a foot or two from the building when "something hit" him and knocked him to his knees. He learned later that it was the "hanger." Confident that he had made out a prima facie case against Mitchell, he rested.

Since the learned trial judge felt compelled by *Hunsberger* to direct a verdict, a brief discussion of our reasons for taking a contrary view seems desirable. There our predecessors reversed, without a new trial, a verdict in favor of Hunsberger. The facts can best be told by quoting from the opinion of Chief Judge Bond, who wrote for the Court:

> "The work was reconstruction of a boiler room for the United States Industrial Alcohol Company, and it had been going on for three months or more. The Combustion Engineering Company was finishing erecting on each side of the boiler, from the first floor up to a height of thirty to thirty-five feet, an iron air duct, or preheater of air for the furnace, consisting of a shaft or chamber inclosed on the sides and surmounted by a box cover, also inclosed except for a small door for cleaning out, near the top. Within the preheater there were plates extending throughout the length, twenty-seven in number, spaced about an inch or an inch and a half apart, and supported by angle irons at intervals. Inside the top were shelves for

workmen to lie on when cleaning out. The plates, or elements, as they were called, were to be welded at the top, and that was the work being done at the time of the accident. Below the preheaters, in the basement, the plaintiff's employer, McNamara & Co., had recently started work of constructing connections of the preheaters with the boiler. The basement was open, no floor boards having been laid above it.

"At the beginning of the day's work on the morning of the accident, Walter Durdella, one of the Combustion Company's workmen, climbed the ladder to the top of the particular preheater they had been working on at the close of the last preceding working day, and began the work of forcing the tops of the plates, or elements, in position for his brother to weld them together from outside the box. The force was applied by means of a metal wedge, in size about a quarter of an inch by about one inch and a half, and ten or eleven inches long, hammered in between two plates. The restriction on the space required Durdella to do the work lying on his stomach. While he was doing this, twenty to thirty minutes after starting work, a wedge fell down through the preheater and struck and injured the plaintiff working underneath it. Durdella's explanation of the occurrence — and he was the only man who had knowledge of what occurred at the top — was that he first drove the wedge in until he was sure it was held fast in place, then, resting his weight on one arm, with the other gave it a hard stroke; and as he did so the wedge jumped out and found its way down through the preheater. At the time Durdella supposed that it must have lodged in the preheater somewhere." *Id.* at 18-19.

After observing that Hunsberger rested his case on an assumption that the mere fact of the falling of the wedge afforded evidence of negligence, Judge Bond continued:

" . . . And apart from any question of the effect on a *prima facie* presumption, if there should be one, of evidence of the facts produced by a defendant *(Byrne v. Boadle,* 2 H. & C. 722; *Heim v. Roberts,* 135 Md. 600, 605, 109 A. 329), the court is of opinion that the mere fall of a tool being used within the building, in work of construction, cannot be presumed to result from negligence, because it cannot be supposed that such a thing is probably the result of negligence every time it occurs. On the contrary, it would seem likely that, with workmen handling loose tools continually, the falling of some of them at times must be expected despite all precautions. To presume otherwise would be to presume a perfection in men's work which we know does not exist. Precautions that will ordinarily keep falling objects from an adjacent highway are required, for the work should not invade the highway. And temporary covered walks built below construction work are common sights. *When objects have dropped on highways it has been presumed, prima facie, that the dropping resulted from lack of the requisite precautions to keep them off. Decola v. Cowan,* 102 Md. 551, 62 A. 1026; *Strasburger v. Vogel,* 103 Md. 85, 63 A. 202. *And there may also be material used in construction work which would not be dropped inside the building if ordinary care were exercised.* The case of the fall of scantling, *Clough & Molloy v. Shilling,* 149 Md. 189, 131 A. 343, is an instance." *Id.* at 19-20. (Emphasis added.)

It requires but a moment's reflection to perceive some conspicuous features which distinguish the case at bar from *Hunsberger.* Harford was not struck by a falling tool nor was he inside the building at the time. Unlike a tool, the function of the "hanger" is both simple and static. Putting it to use involved nothing more than screwing it into the steel plate already fastened to the underside of the floor above. Even if it had slipped from the workman's hand one would expect it to fall no farther than the floor. What made it.

plunge to the ground outside the building Harford did not say, quite obviously because he did not know. It might well be said that the italicized sentences in the quotation from Judge Bond's opinion emphasize the distinction between the facts of the case at bar and the facts of *Hunsberger.* Indeed his reference to *Clough & Molloy* quite effectively enhances that notion. In that case *(Clough & Molloy)* workmen had hoisted several scantlings (4″ x 4″ x 10′) to the top of scaffolding being used by masons to put the capstone on a chimney. One of the scantlings fell striking Shilling, the roofing foreman, and killing him. Judge W. Mitchell Digges, for the Court, said:

> "Applying the rule as laid down and sustained by these authorities to the facts in the present case, we find that the deceased Shilling came to his death as a result of being struck by a piece of scantling falling from the scaffolding or eaves at or very near the point where the defendant's servants were engaged in work; that they had under their control and management a number of pieces of scantling of the same or similar description as the piece which caused the death of Shilling; that these employees of the defendant were the only ones at work upon the scaffold or building at or near the point from which the scantling fell. These facts, we think, are sufficient to raise the presumption of negligence on the part of the servants of the defendant and make such a *prima facie* case as needs to be rebutted by the defendant." 149 Md. at 207.

In *Fields, supra,* during work on an unfinished ship a piece of rough staging (2″ x 12″ x 7′) fell from above and struck Fields as he was passing under the fiddley. Chief Judge Marbury, writing for the Court, said:

> "This Court thinks that the evidence was sufficient to justify submitting the case to the jury. Appellee's employees were working in this opening. They were the only ones working there. The defendant was the only contractor doing insulation in the ship. Its men had been putting asbestos on

ducts up in this space all morning. There were two men in white coveralls (unusual for other workers on shipboard) working there just a few minutes or seconds before the accident, when the plaintiff crossed under them. Asbestos was falling then. There is testimony that there were no other persons in the space by the smoke stack at the time. The board with asbestos on it fell from that direction. Under these circumstances the reasonable inference is that a board under the control of the employees of the appellee was negligently permitted to fall and struck the plaintiff." 188 Md. at 452.

After the citation and a brief discussion of *Strasburger v. Vogel*, 103 Md. 85, 63 A. 202 (1906), Judge Marbury went on to say:

" . . . In the case before us the plaintiff has shown no independent cause. He has shown that the defendant's workmen were in charge of the place from which the plank fell and they were the only ones there. The fact that two employees of the Dry Dock Company were found there a half hour later does not affect the situation at the time of the accident. It may be that the defendant will be able to show that the plank fell from some other cause than the negligence of its employees, but we think the facts produced by the plaintiff make a *prima facie* case.

\* \* \*

"In the case of the *Combustion Engineering Company v. Hunsberger*, 171 Md. 16, 187 A. 825, this Court said that the mere dropping of a wedge was not necessarily evidence of negligence. In that case the man who was driving the wedge thought it was firmly in place, gave it a hard blow, and it jumped out. The court said that even with the greatest practicable care a workman might be surprised at the resistance of metal, and, in the

case before it, evidence would be needed to the contrary. However, the court also said that there might be material used in construction work which would not be dropped inside of a building if ordinary care were exercised and gave an illustration of the fall of scantling in an earlier case, *Clough & Molloy v. Shilling*, 149 Md. 189, 131 A. 343, 348. This last case is quite similar to the case before us. The court, in that case, said that the testimony tended to prove that employees of the defendant were working upon the scaffolding at the time of the accident; that they were using in their work pieces of scantling and at least three pieces were pulled up to the scaffold; that the death in the case was caused by a falling piece of scantling which came from above him and in the direction of the place where defendant's employees were working. The court said, 'From these proven facts, under the authorities in this state and elsewhere, there arose a legal presumption that the falling of the scantling which caused the death of Shilling was due to the negligence of the defendant's employees, either in negligently doing an act which a reasonably prudent man would not have done, or omitting to do an act which an ordinary prudent and cautious person would have done, under similar circumstances.' " 188 Md. at 453-54.

Mitchell seems to find comfort in *Leikach v. Royal Crown Bottling Co. of Baltimore, Inc.*, 261 Md. 541, 276 A. 2d 81 (1971), where we repeated the three criteria for successful reliance upon the theory of res ipsa loquitur, as they were set out in *Munzert v. American Stores Co.*, 232 Md. 97, 104, 192 A. 2d 59 (1963). He argues that Harford has not satisfied the first criterion, *i.e.*, there must be "[a] casualty of a sort which usually does not occur in the absence of negligence," quoting a generality found in *Hunsberger:*

" . . . But, as stated, it seems to the court plain that there must be some falling of small tools and other objects handled with ordinary care in the course of

> the work, and that therefore a particular fall cannot, of itself and without more, afford proof of negligence. Unless facts appear to indicate negligence, it must be taken as no more than one of the incidents of the work, to be expected." 171 Md. at 20.

We are not to be persuaded, on this record at least, that Harford's injury was caused by the falling of a small tool or other object handled with ordinary care in the course of the work. Mitchell may be able, upon remand, to prove that to be the case but until it does so we think Harford is entitled to the benefit of a presumption of negligence.

Mitchell argues also that because there is some evidence that Most and Matthews were on the materials tower at the time of the accident the requirement of exclusive control has not been met. Whatever merit there may be in this argument, and we think, at best, it is minimal, it is emasculated by what we said in *Leidenfrost v. Atlantic Masonry, Inc.*, 235 Md. 244, 250, 201 A. 2d 336 (1964). As put by Judge Marbury, for the Court:

> "Atlantic argues that the extent of control must be so complete as to negate the possibility of an intervening cause beyond its control. However, evidence of complete control is not required. It may be established by evidence sufficient to warrant an inference of its existence, and circumstantial evidence may suffice. The plaintiff is not required in his proof to exclude remotely possible causes and reduce the question of control to a scientific certainty."

Mitchell, in its brief, insists that the facts, *infra*, "eliminate any presumption that the object which fell came from an area in which ... [it] had exclusive control." We suspect Mitchell is putting us on when it says:

> "Although the tower was some vertical as well as horizontal distance from the position where Harford places himself, this fact alone does not eliminate the possibility of the falling object

emanating from the area of the tower. Dr. Borkovic stated that if the hanger introduced at trial fell six stories and hit on top of Harford's head without a hard hat, it would go right through his skull if it were traveling 'in a longitudinal direction.' None of the witnesses who testified for Harford could say where or from which direction the pipe came other than it was falling when it struck him. Harford's own opinion of how the pipe hit him suggests that it came 'down a slope.' "

One needs only to read the testimony [1] of Dr. Borkovic to understand that he did not mean to imply that the hanger, as it fell, deviated from a line perpendicular to the surface of the ground. Quite obviously he meant that if the hanger was in a vertical position when it struck Harford it would have gone through his skull. And so it would even if he had been wearing a "hard hat." Nor can there be any doubt that when Harford said, "[I]t came *down a slope* like this, hitting me in the front of the head, where the ten stitches was, such as your hand hitting thusly, like this [indicating]" he meant that his injury resulted from a glancing blow and not that the hanger, in falling, deviated from the perpendicular.

*Judgment reversed.*
*Case remanded for a new trial.*
*Costs to be paid by the appellee.*

---

1. "Q. Doctor, if this fell some six stories in this fashion and hit a man on top of the head without a hard hat, wouldn't that go right through his skull? (Indicating.) A. If it were traveling in a longitudinal direction, yes.

"Q. Like that? (Indicating.) A. Yes, it most certainly would.

"Q. Go right through his skull. A. Unless it glanced off of the side of the head. It would depend on where it struck him on the head."