COMMERCIAL CREDIT COMPANY *v.* L. A. BENSON COMPANY, INC.

[No. 2, January Term, 1936.]

*Decided April 9th, 1936.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Duane R. Dills* and *Malcolm H. Lauchheimer,* with whom was *Sylvan Hayes Lauchheimer* on the brief, for the appellant.

*George Cochran Doub,* with whom were *James Carey, 3rd,* and *Parker, Carey & Doub,* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

The Commercial Credit Company, appellant herein, is a corporation engaged in commercial banking, and in connection with this business extends financial aid to various business concerns unable to finance their own engagements and undertakings. The appellee, L. A. Benson Company, has for some time been engaged in furnishing certain materials and supplies to its customers, including the Poole Engineering & Machine Company, of Balti-

more, Maryland, to which between July 22nd, 1931, and January 7th, 1932, it made deliveries on orders amounting in value to approximately $4,300. This customer was adjudicated a bankrupt in January, 1932, its charter was forfeited for nonpayment of taxes, and appellee failed to receive settlement for the merchandise thus sold and delivered. Accordingly, on November 22nd, 1934, it brought suit in the Superior Court of Baltimore City against appellant to recover from the latter the purchase price of the materials thus ordered by the Poole Company.

At the conclusion of the appellee's testimony, by reason of its concession of certain prayers offered by defendant below, the sole issue remaining for the consideration of the jury was whether, in ordering the supplies, the purchase price of which was the subject of the suit, the Poole Engineering & Machine Company was acting as agent for the Commercial Credit Company, and the verdict of the jury having been favorable to appellee, an appeal is taken by the defendant below from the judgment entered thereon.

The lower court rejected appellant's A and B prayers, which were demurrers to the evidence. It therefore becomes necessary at the outset to determine whether there exists in the case evidence of sufficient probative force to enable an ordinarily intelligent mind to draw a rational conclusion in support of appellee's theory that the relation of principal and agent existed between appellant and the Poole Engineering & Machine Company at the time the latter ordered the supplies in question, for if there is present in the case evidence tending to establish such relation, this, together with all legal presumptions fairly deducible therefrom, must be taken as true. *Clough & Molloy v. Shilling*, 149 Md. 189, 131 A. 343; *Abuc Trading etc. Corp. v. Jennings*, 151 Md. 392, 135 A. 166; *Atlas Realty Co. v. Galt*, 153 Md. 586, 139 A. 285; *Purdum v. Edwards*, 155 Md. 178, 141 A. 550. The evidence relied upon by appellee as being sufficient to require the court to submit for the jury's determination the existence of such relation admits of no dispute, and consists entirely

of certain transactions which took place between appellant and the Poole Engineering & Machine Company in 1931, and the circumstances surrounding the same, which, for the purpose of this opinion, may be summarized as follows:

In March, 1931, the Poole Engineering & Machine Company, a Maryland corporation, for convenience hereinafter referred to as "Poole," maintained a plant at Woodberry, Baltimore, Maryland, where for many years it had conducted upon an extensive scale the business of manufacturing machinery, castings, and products of a similar nature. In June, 1930, it had entered into an agreement with the Electromatic Voting Machine Corporation for redesigning and manufacturing voting machines, as to the manufacture of which the latter held patent rights. Shortly thereafter Poole obtained a contract with Allegheny County, Pennsylvania, to manufacture for it one thousand of these machines, but this contract was held invalid by the courts of that state upon technical grounds, whereupon Poole and Allegheny County, in March of that year, entered into a second contract upon substantially the same terms and conditions. At that time, because of having been held up through litigation, Poole's liquid assets had become materially depleted, and it made application to the Commercial Credit Company, hereinafter referred to as "Commercial," for a loan of $150,000 to enable it to manufacture for Allegheny County the machines in question. Poole and Commercial then entered into an agreement whereby the latter would advance the former $150,-000 in installments of $50,000 each, the first of which was payable on March 28th, 1931, and the other two at intervals of thirty and sixty days apart; Poole agreeing to execute promissory notes to Commercial for such advances as and when the same were made, the notes to bear interest at six per cent., Poole also to assign to Commercial as security for the repayment of such obligations its contract with Allegheny County for the manufacture of such voting machines. Commercial, in

addition to receiving repayment of the sums so advanced, with six per cent. interest thereon, was also to be paid $50 per machine for the first one thousand machines and $10 for each additional machine up to three thousand; the expressed consideration for the charges last mentioned having been the advance of the money to Poole. The process of manufacturing the machines having begun, it was soon realized that deliveries were going to be slower than anticipated; that lack of funds, because of inability to make deliveries, made it necessary to obtain additional money for Poole's pay roll. This led to another application to Commercial for $50,000 additional, and Poole and Commercial, on June 29th, 1931, entered into a second agreement, which in many respects was similar to their former agreement, in that as such advances were made for the $50,000, Commercial was to receive Poole's interest-bearing obligations, indorsed by its president, Poole also assigning its interest in contracts which it held with Schuylkill and Northumberland counties, Pennsylvania, for the manufacture of certain additional voting machines, which contracts had been obtained by Poole since the execution of the first agreement. Commercial was also to receive, as a bonus for the amounts advanced thereunder over that provided for in the first contract, an amount proportionate to the increase of Poole's indebtedness to Commercial above the $150,000, Poole agreeing to deliver to Commercial the original remittances under the contracts thereby assigned, Commercial to deposit these and turn the total thereof over to Poole, less an amount equal to $250 per machine, instead of $200 as in the first contract. When this agreement was executed on June 29th, 1931, at Commercial's request, a Mr. Ningard, one of Commercial's engineers, became associated with Poole's plant and acquainted himself with the construction of the machines, and Poole's agent, Shoemaker, was to extend Ningard all information possible concerning their manufacture. On July 1st Commercial advanced Poole $12,500 under the second agreement and a similar sum one week later.

By July 15th, a mechanical defect had developed in the machines, and on July 21st a conference was held between the Maryland Casualty Company, Poole's surety under the Pennsylvania contracts, the representatives of Commercial, and Poole's representatives, at which this difficulty was discussed. The president of Poole explained the situation to all present and stated his unwillingness to permit his creditors to continue manufacturing and shipping parts to his plant, unless the machines then being made would function properly. Apparently at that time Poole's president viewed the situation as hopeless and one which it was useless to expend further effort upon. However, on the following day, officials of Commercial and the representative of Electromatic visited the office of Poole and there met representatives of the latter. As a result of a frank discussion of the situation which then took place, the consensus of opinion was that the mechanical defect in the machines could be overcome, and, if production were speeded up, Allegheny County would accept and pay for the machines it had contracted to purchase, while Commercial would continue to advance the necessary money to complete existing contracts and carry out the work, upon condition that it have a representative in the Poole plant to oversee expenditures and purchases in connection with voting machine production. This suggestion was accepted by Poole's president, it being understood that a Mr. Hopkins was to be placed in the plant for the purpose above stated, Poole's president signing a letter requesting such supervision. From that time on Ningard, the engineer, and Hopkins, both representatives of Commercial, remained at Poole's until near the time it was adjudicated a bankrupt. While there Ningard's duties were that of assisting Shoemaker, Poole's vice president and general manager, in making estimates of requirements for materials, which, when made, were turned over to Poole's purchasing agent, who gave orders for the same. Hopkins, in connection with Poole's president, passed upon the matter of purchases as well as cash expenditures.

Shortly after arrival of these representatives at the Poole factory, the $25,000 advanced by Commercial under the second agreement had been spent, but no deliveries of voting machines had been made by Poole, and, in view of the mechanical difficulty it had so recently encountered, there was no immediate prospect of being able to make deliveries and collections. Meanwhile, payments necessarily had to be made from time to time on material accounts, and Poole's weekly pay roll had to be provided for. This was the situation on July 15th, 1931, previous to which Commercial had advanced Poole $175,-000. It now had the choice of furnishing no more money to Poole and taking an outright loss equivalent to this sum, or continuing to co-operate with Poole, not only by furnishing Ningard and Hopkins to advise and assist its officers, but as well to supply the necessary money from time to time to meet its pay roll and certain material bills. It accepted the latter course, and from July 24th, 1931, to January 15th, 1932, Commercial made weekly advances to Poole for these purposes, totaling $151,790.18. Throughout this period Commercial's interest lay in protecting the amounts advanced by it, which, as noted, were in excess of $300,000. However, by agreement of Poole and Commercial made in October, 1931, a rider was attached to their second agreement. By this the two previous contracts between them were to continue in full force and effect, except as otherwise provided therein; it being recited that, in addition to repayment of all moneys advanced to Poole by Commercial, which advances were evidenced by Poole's promissory, interest bearing, notes, Poole agreed to pay Commercial a sum for each machine manufactured and delivered by it up to one thousand voting machines, such sum to be in the same proportion to $50 as the highest total amounts previously or subsequently advanced by Commercial to Poole and outstanding at any one time "is proportionate to the sum of One Hundred Fifty Thousand Dollars ($150,000.00), together with a further sum for each voting machine of the next three thousand (3,000) voting

machines in excess of the first (1st) one thousand (1,000) voting machines manufactured and delivered by Poole, which sum shall be in the same proportion to the sum of Ten Dollars ($10.00) as the highest total amounts heretofore or hereafter advanced to Poole and outstanding at any one time, is proportionate to the sum of One Hundred Fifty Thousand Dollars ($150,000.00)."

The above sums which Poole thus agreed to pay to Commercial were to be in lieu of the amounts it had agreed to pay, in addition to the repayment of advances made by Commercial and interest thereon.

Commercial was not a stockholder of Poole and had no representation upon its directorate, while Poole was a well established corporation, and as late as December 31st, 1930, its current assets were in excess of $400,000 as against current liabilities of $242,000. Undoubtedly its financial status had become impaired at the time it sought the aid of Commercial, and this condition prevailed until bankruptcy, but it was the opinion of its president, even at the time he gave testimony in this case, that everything would have worked out all right had it not been for the litigation pertaining to its contracts with the three Pennsylvania counties. Throughout its period of dealing with Commercial, Poole's affairs were in the hands of its nine directors and officials chosen by the latter. These directors approved the original contracts between Poole and Commercial, but Poole's president did not recall that there had been a meeting of the directors as a result of the change occasioned by the letter of July 22nd, nor was it discussed either with Poole's general manager or assistant secretary, both of whom, as well as the president, were members of the board, which, it may be observed, met upon another matter as late as November.

It thus appears that Poole's corporate structure was unaffected by its dealing with Commercial; that it continued its business, and at no time surrendered this business nor control thereof to Commercial. Moreover, these officials acted for Poole in all matters affecting the manu-

facture of the machines, whether in regard to ordering supplies or making up the pay roll, and there is no contention that at any time Commercial held itself out in any manner which would cause those extending credit to believe Commercial was interested as a principal. On the contrary, it is appellee's theory that Commercial's liability is that of an undisclosed principal, which relation arose because of its dealing with Poole and supervision of the Poole business, through its representatives, Ningard and Hopkins. However, the president of Poole was specific in regard to the nature of their activities. We quote from his testimony: "Q. To what extent did Hopkins and Ningard participate in the physical operations of the plant? A. They were familiar with everything that we were doing, and participated in all questions requiring decisions of any importance at all. Q. Did they act in any advisory capacity, or did they act in a directory capacity? A. They acted in a co-operative capacity and consulting capacity, I might say, more than in an actual directing capacity. Everything was done with complete mutual agreement."

By the latter part of the year 1931, Poole had received payments for the voting machines mentioned in the contracts, and turned the funds over to Commercial, which in turn retained a certain part thereof and turned back to Poole a sum far more than sufficient to enable it to discharge its obligations under its agreement with Electromatic Voting Machine Corporation, under which it had been allowed to manufacture the machines in question, but the amount retained by Commercial was insufficient to discharge Poole's obligations to it under their agreements.

Under the facts and attending circumstances above outlined, it appearing that Commercial's interest consisted solely in having itself repaid the amount due it under its agreements with Poole, that the corporate identity of Poole throughout its dealing with Commercial was in no sense changed, that Poole carried on the business through its own officers, and the services of

Hopkins and Ningard were rendered in an advisory, cooperative, and consulting capacity, with no actual authority on their part to compel obedience to their orders, their conduct, by virtue of Commercial's financial interest, was both permissible and proper under the agreement between Poole and their principal. There being an entire absence of evidence tending to show that Commercial and Poole had agreed that the latter act as agent of the former, that it was engaged in the manufacture of voting machines as Commercial's agent, and that while engaged in manufacturing such machines it was subject to Commercial's control, the court fails to find the evidence legally sufficient to justify submitting to the jury the question of such agency. *Am. Law Inst., Restatement of Agency, sec.* 1; *Mechem on Agency,* secs. 1763, 1764; *Brown v. Tainter,* 114 App. Div. 446, 99 N.Y.S. 1030; *Essex County, etc., Corp. v Pierce Arrow Sales Co.,* 288 Mass., 270, 192 N.E. 604; *Chicago Mill & Lumber Co. v. Boatmen's Bank* (C.C.A.) 234 Fed. 41; *Fourth Nat. Bank v. Portsmouth Cotton Oil Ref. Corp.* (C.C.A.) 284 Fed. 718; *Chase v. West,* 121 Me. 165, 166, 116 A. 213; *Kirby v. Lackawanna Steel Co.,* 109 App. Div. 334, 95 N.Y.S. 833; *Dubos v. Jones,* 34 Fla. 539, 16 So. 392; 63 *A.L.R.* 919, note; 48 *A.L.R.* 1072, note; 55 *A.L.R.* 291, note. See, also, 21 *R.C.L.* at page 819, where it is stated: "Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or acts."

We likewise quote from *Mechem on Agency, supra:* "It must be kept in mind that the rules here considered contemplate the actual existence of authority from a principal, though he be not disclosed. There is no more warrant for holding an undisclosed party liable for acts which he did not authorize than there is for holding a disclosed party in such a case. In fact there is often much less warrant. It is therefore an indispensable part of the plaintiff's case to show that the alleged principal was really such as to the act in question."

In this case the relations of the parties were that of

debtor and creditor. The chief interest of Commercial was in receiving the money loaned by it, together with the compensation agreed upon between the parties for its use. In order to assure this result, it was agreed between them that the lender should have representatives at the plant of the borrower for the purpose of checking upon disbursements of the funds thus advanced, as well as the proper application of incoming funds. This conduct cannot be construed to create the relation of principal and agent, especially so when such construction would do violence to the actual intentions of the parties, and where such an inference could not be justified by reason of their conduct. The act of Commercial in placing its representatives at the plant of its debtor reflected only the natural instincts, interest, and solicitude of any other creditor then in its position, and Commercial is not on that account alone to be penalized by being declared the principal. Appellant's A and B prayers should have been granted.

In view of this conclusion, it becomes unnecessary to pass upon the exceptions taken by appellant to the rulings upon evidence. The judgment appealed from will be reversed without a new trial.

*Judgment reversed, without awarding a*
*new trial, with costs to appellant.*