BUCK et al., Respondents v. NASH-FINCH COMPANY,
a Delaware Corporation, Appellant

(102 N.W.2d 84)

(File No. 9754. Opinion filed April 8, 1960)
Rehearing denied May 6, 1960.

**Danforth, Bleeker & Carlson,**Mitchell,**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Defendant-Appellant.

**Morgan & Fuller, LeRoy S. Lassegard, Fellows, Fellows & Tinan,** Mitchell, for Plaintiffs-Respondents.

SMITH, Judge.

The above entitled actions were consolidated for trial and appeal pursuant to stipulation of counsel. Trial was had to the court without a jury. On the theory that Nash-Finch Company, a Delaware corporation, defendant above named, was liable as the undisclosed principal of one Lawrence Boe-

deker, doing business under the name of Piggly Wiggly First Avenue Market in Mitchell, South Dakota, the trial court awarded several judgments to the above named plaintiffs against Nash-Finch Company for merchandise sold and delivered to Boedeker. This appeal followed.

The trial court expressed the view that Nash-Finch Company, a mortgage creditor of Boedeker, assumed control of Boedeker's market and direction of him and thus became his principal and liable for all of his purchases of merchandise from the several plaintiffs above named.

The paramount question presented by the assignments of the defendant is whether the court's finding of an agency relation between Nash-Finch and Boedeker is supported by the evidence.

The operative facts are little in dispute. The market in question is the Piggly Wiggly First Avenue Market in Mitchell, South Dakota, owned by Lawrence (Doc) Boedeker. The period of the claimed control by Nash-Finch Company is from April 12, 1957 until September 20, 1957.

Understanding of the facts will be aided by identifying the corporations and persons having some connection with the operation of the market.

The Piggly Wiggly Company of Jacksonville, Florida, is engaged in the business of franchising individuals and corporations to operate markets under the Piggly Wiggly name. At the times in question it was under contract to a W. C. Metzger Company to allow it to grant such franchises in the territory here involved. The franchise contract of a particular store obligated W. C. Metzger to supply the store with Piggly Wiggly advertising and merchandising advice. Service representatives were provided who called regularly on the store and offered advise to its owners and employees. For the use of the name and the Piggly Wiggly services, the individual market paid a percentage of its gross sales.

The Nash-Finch Company, a Delaware corporation, with its principal place of business in Minneapolis, Minn., is a

wholesaler of merchandise. The Merchants Finance Company is a wholly owned subsidiary of Nash-Finch Company. It was through Merchants Finance Company that Nash-Finch Company financed the market here in question. One John T. Hanson is an officer of both of the above named corporations in charge of credit. Nash-Finch Company operates what it calls a Retail Service Division, through which it provides advertising, merchandising, and accounting service to its retail outlets. That division maintained a Sioux Falls office, through which a Mr. Osborn rendered merchandising service and a Mr. Rudd accounting service to the Boedeker market.

Mr. Boedeker had operated a market in Mitchell and had been a customer of Nash-Finch for many years. Representatives of that company had suggested that he undertake a larger operation. After his store burned in August 1955 Nash-Finch offered to finance such an expansion. Thereupon Boedeker entered into a lease with a third person who erected a building of the proper specifications, and arranged with Piggly Wiggly Company and the Metzger Company for a Piggly Wiggly franchise, and for the purchase and installation of special store fixtures and equipment. Acting through Mr. Hanson, the Merchants Finance Co. made an initial loan to Boedeker of $30,000. When it became apparent that more capital was needed to equip and stock the market an additional loan of $20,000 was made by that company. These obligations were evidenced by demand notes, secured by chattel mortgages on the fixtures, equipment and stock of merchandise, real estate mortgages on two Mitchell residence properties and an assignment of insurance contracts on the life of Boedeker. The market opened under the name of Piggly Wiggly First Avenue Market.

After the additional $20,000 loan, much of which was used in stocking the store, at the insistence of Nash-Finch, an arrangement was made whereby the service division of that company did the accountancy for the market. An accountant from that office visited the store twice a week. He made up the payroll, entered checks on the register, com-

piled a weekly operating report from records of sales and deposits, and at five-week intervals a financial statement. Copies of these reports went to Boedeker and to Hanson of the Nash-Finch and Merchants Finance companies. Early in 1957, under circumstances not made clear in the record, at the insistence of Mr. Hanson, the accountant began to countersign all checks issued by Boedeker. He paid a monthly fee for this accountancy.

After the additional $20,000 loan was made, purchases of merchandise from Nash-Finch Company were made according to a check with order requirement. Almost no additional credit was granted Boedeker from that point forward.

A very large portion of the merchandise purchased by Boedeker for the market came from sources other than Nash-Finch according to a system of short-term credits. Boedeker habitually purchased on credit large shipments of coffee, and a quantity of cigarettes, and resold some portion thereof at wholesale for cash to other merchants. To avoid payment of a percentage of these wholesale transactions under his Piggly Wiggly franchise contract, and to provide himself with a cash reserve for use in cashing checks, and to meet emergencies, Boedeker did not run these cash wholesale sales to merchants through his register but retained the cash in a separate McCaskey System drawer.

Through the financial reports, above described, and the visitations of Nash-Finch servicemen, Mr. Hanson kept in constant touch with operations and financial condition of the store. It became apparent by the last of 1956 that a sufficient volume of merchandising was not building up to carry such an operation. Nash-Finch representatives, who were giving merchandising advice, had suggested that Boedeker hire an experienced and skilled store manager in an attempt to better his situation. At the outset he rejected the suggestion and said he could deal with the problem. However on March 2, 1957 a service representative of Nash-Finch, in making a daily report of his calls, wrote, "Doc. also told me that if we have a good man to put in the store as a Mgr. it would be O.K. with him. because he would like to make a go of it."

Thereafter Nash-Finch notified Boedeker that such a man was available. On April 2, 1957 Mr. Hanson appeared at Mitchell with one Estel Parshall. He explained what they knew of Mr. Parshall and suggested he be hired. There had been some consideration given among the Nash-Finch executives to placing Parshall on its payroll. In the interoffice memos appearing in the record here we find the following:

"Recently Mr. Dannatt instructed me to put Estel Parshall on our payroll. He would work for us in the First Avenue Piggly Wiggly store in Mitchell, South Dakota.

"Mr. Hanson called today from Mitchell and requested that we change this and that Mr. Parshall would go on the payroll of the First Avenue Piggly Wiggly.

"We would pay $62.50 of his $100.00 salary for the week ending April 13th and for the next four weeks we will send them a check for $25.00 for each week. The First Avenue Piggly Wiggly will stand the balance of $75.00 per week."

In the course of the conference during which Boedeker hired Parshall, he asked Mr. Hanson, in substance, what if I find I do not like Mr. Parshall or if I find him incapable, and Mr. Hanson answered, "I had to get along with Estel or else." Boedeker testified he understood Mr. Hanson to mean that he had to get along with Parshall or Merchants Finance would foreclose.

After Mr. Hanson returned to Minneapolis, he dictated a memo as a record of his understanding of the matters agreed upon between the parties at the Mitchell conference. A copy of that memo went to Boedeker and to Nash-Finch executives. It reads as follows:

Memorandum—Re: First Ave Piggly Wiggly, Mitchell, South Dakota.

"Boedeker mentioned some weeks ago to Seveland and later to me that he would like to have us

help him find some one to come in as manager of the store to see if the situation could be improved.

"Such a person was found in Estel Parshall and while I was at Mitchell on the 10th, Doc hired Estel as store manager at $75.00 per week.

'The arrangement agreed on by Boedeker was that Estel would be the store manager and that Doc that day would call the employees together and advise them of that fact.

"Estel is to head up the produce department, but his duties would also extend to all departments of the store.

"Estel is to handle all the money both that coming in and going out. It will be up to him to check the cash registers, make the deposits, handle all payouts, make up the payroll and pay off employees. In connection with the records, he is to keep all books and records which are needed so that the accountant at Sioux Falls, can make up his records and reports. At the present time Rudd is coming out to Mitchell twice a week, but it is hoped that as time goes on it will not be necessary to Rudd to come out more than once a week and probably later on it might not be necessary for him to make weekly trips. It is conceivable in the end that Estel might pay all the bills. However, we can see about all that later, as the main thing is to get the store going and get additional volume in there. At the present time the store is running a little over $6,000.00 sales per week as compared to close to $8,000.00 a year ago.

"Doc and Estel will work out the advertising together—they will handle the personnel together, and handle the overall store problems together, including ing expense and promotion.

"Each of them is to draw $75.00 per week and they are both to pay for whatever groceries they use out of that $75.00.

"The practice of issuing 'Piggly Wiggly' checks is to be discontinued and the handling of the payroll should be changed from a cash payout basis to a check basis. However, that is something that need not be done immediately—that is—the part referring to the payroll. However, the so called McCaskey system of handling money is to be discontinued and money coming in and money paid out is to be handled in accordance with accepted practice for retail grocery stores, which means for one thing that all 'paid outs' must go through the cash registers and that all money coming from the sale of merchandise whether it be to other grocers, to institutional accounts or to consumers, goes through this cash register.

"At present some checks are mailed out altho there is not enough money in the bank to cover them. This practice is to be discontinued so that there will be money in the bank to cover any checks which are sent out or given to people who have money coming.

"Outside buying—that is—buying merchandise which can be bought from Nash Finch from other sources—this is to be discontinued as soon as possible.

"Pay all bills by check or through National Cash Register 'paid outs'.

"Handle coffee money through the cash registers. This has reference to the practice of buying, let us say, thirty cases of a popular brand of coffee and selling fifteen cases to another retailer and then collecting cash for that sale. This should be handled through the cash registers just like any other sale.

"Tony, who has been in charge of the produce department, is to be laid off at once.

"The locks on the building should be changed and new keys issued. I suggested the only ones to hold the keys be Doc and Estel.

"It is hoped that this new set-up with Estel and Doc each drawing on their experience and contributing their best efforts to the business, will result in a profitable operation."

Boedeker was put forward as a witness for plaintiffs. On direct examination counsel asked him whether there had been such an understanding between Mr. Hanson and him as to each separate item mentioned in the foregoing memo. In almost every instance he denied such an understanding. In substance he stated it to have been his understanding that: Parshall was to come in to help him with advertising and promotions, and to take charge of the produce department; they would talk over store problems; they would each draw $75 per week; and buying from sources other than Nash-Finch would be discontinued as soon as possible.

After the April 1957 conference with Mr. Hanson and the hiring of Parshall, changes were made in the store. An employee who had handled the procedure was discharged and Parshall took over his duties; Parshall raised the salaries of two or three employees; he made up the cash and attended to deposits; he insisted that everybody who took merchandise from the store including Boedeker go through the check-out lanes; he changed the locks on the doors and Boedeker and he carried the keys; he discharged Boedeker's stepson when he caught him in a very minor misapplication of cash belonging to the store; and in at least two instances he made reports and sought instructions from Hanson, viz., whether the stepson should be discharged and whether Boedeker be permitted to continue the practice of retaining cash receipts from wholesale coffee sales in the McCaskey drawer to serve as a much needed cash reserve.

However no change was made in the procedure previously followed in buying merchandise after the April 12th

meeting with Hanson. Meats, produce and some other items were ordered by the heads of departments. Major buying was done by Boedeker. As to any character of control of buying by either Mr. Hanson or Mr. Parshall the record is silent. As indicated above there was an understanding that purchases from sources other than Nash-Finch would be discontinued as soon as possible. Mr. Boedeker explained he was compelled to buy elsewhere in order to get merchandise because Nash-Finch would not grant him credit.

Representatives of Nash-Finch and of Metzgers continued their service visits, advice, and help as before. The practice of the accountant in dealing with checks indicates that certain checks were prepared and countersigned as a matter of routine; other checks were only prepared at the request of Boedeker. When prepared and countersigned they were left with Boedeker. Except when the cash in the bank was insufficient to meet a check upon presentation the accountant did not refuse to prepare and countersign any check requested by Boedeker. The system of depositing all cash, and paying out by check, reduced Boedeker's personal withdrawals from the business to $75 per week until late in the summer when at the suggestion of Mr. Hanson he increased his withdrawal to $100 at a time when Nash-Finch discontinued subsidizing Parshall's salary and making payment of insurance premiums.

We content ourselves with a broad description of the exhibits contained in Mr. Hanson's work file including correspondence and memos. They evidence that he kept in active touch with operations, asked questions, made suggestions about insurance coverage, etc., and requested payments on interest and principal. Payments were made on interest but none on principal. Most of his letters were in terms of suggestion, or request. In one instance, a letter dealing with what he deemed to be an unreasonable grant of credit to a third concern was commanding in tone.

Operations continued as above described until September 20, 1957. On that day arrangements were made whereby

Boedeker sold the store to a Piggly Wiggly Hills Company, a corporation in which Nash-Finch Company holds a controlling interest. That transaction is involved in litigation in another action and is not of present significance. The purchaser took immediate possession and the claims involved in these consolidated actions represent the amounts due to unpaid creditors of Boedeker as of the date his operations were discontinued.

That Merchants Finance and Mr. Hanson represented Nash-Finch Company is not questioned, and we understand the parties to agree that if Boedeker become the agent of Nash-Finch Company in operating the market in question, and in making the described purchases, the plaintiffs, upon discovery of the relation, could elect to hold Nash-Finch Company. F. A. Patrick & Co. v. Grand Forks Mercantile Co., 13 N.D. 12, 99 N.W. 55; 3 C.J.S. Agency § 244, p. 170; and 2 Am.Jur., Agency, § 393, p. 308.

In support of the conclusion of the trial court, plaintiff's counsel turn to Restatement of Agency 2d, § 14 O. reading as follows:

"A creditor who assumes control of his debtor's business for the mutual benefit of himself and his debtor, may become a principal, with liability for the acts and transactions of the debtor in connection with the business."

We deal with an alleged actual agency; a consensual relation said to have been manifested by conduct rather than by express agreement.

Our statutes defines agency as "the representation of one called the principal by another called the agent in dealing with third persons", SDC 3.0101, and provide "The agency and authority may be created by precedent authorization or subsequent ratification", SDC 3.0104. A more complete definition appears in Restatement of Agency 2d § 1(1) as follows: "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject

to his control, and consent by the other so to act." In comment a. under that subsection it is written: "The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control." And under comment b. it is said: "Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so. To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relation between them to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow. * * *" And see Williston on Contracts, 3d Ed., § 274.

Elsewhere it is written: "Mutual assent of the parties is essential to the relation of agency." 2 C.J.S. Agency § 18, p. 1042.

The following text appears in 2 Am.Jur., Agency, § 24, p. 26.

> "Whether an agency has in fact been created is to be determined by the relations of the parties as they exist under their agreements or acts. * * The question is to be determined by the fact that one represents and is acting for another, and not by the consideration that it will be inconvenient or unjust if he is not held to be the agent of the latter, * * *."

Mechem on Agency, 2d Ed., § 1764, adds a word of caution as follows: "It must be kept in mind that the rules here considered contemplate the actual existence of authority from a principal, though he be not disclosed. There is no more warrant for holding an undisclosed party liable for acts which he did not authorize than there is for holding a disclosed party in such a case. * * *"

The evidence has been carefully examined with these accepted principles in mind. As a result of that analysis we have experienced no difficulty in discovering a basis in the evidence warranting a finding of an assumption of control by Nash-Finch Co., and a yielding of and acting under such control by Boedeker in certain phases of his business. The crucial inquiry is whether the record supports a finding that the described assumption and yielding of control extended to the buying of merchandise for the market. Hence we rephrase the paramount issue stated supra, more in detail, as follows: Was it reasonable for the trier of the fact to infer from the evidence that Nash-Finch Company and Boedeker, by their conduct, manifested a mutual intention and agreement that as of April 12, 1957: (1) Nash-Finch Company should assume control of the buying of merchandise for the market in question, (2) Boedeker would serve in the business as the buyer under the direction of Nash-Finch Company and (3) during the period from April 12 to September 20, 1957 the parties acted pursuant to that agreement.

The core of the argument of counsel for plaintiffs is that in seeking to protect its interests Nash-Finch Company, with the understanding and consent of Boedeker, assumed complete control of Boedeker's business and direction of all of his activities therein, and by so doing, inadvertently it became caught in its own web and liable under all of his contracts for the purchases of merchandise. As the above quoted authorities indicate, if the premise that Nash-Finch Company manifested an intention to assume complete control of the business, and Boedeker consented to act therein under the complete control and direction of that company is

warranted under this record, it would follow as a matter of law that Nash-Finch became liable as indicated by counsel even though it did not actually intend to bring about such a consequence. Such, as we understand it, is the teaching of the comment under § 14 O., Restatement of Agency 2d, reading as follows:

> "A security holder who merely exercises a veto power over the business acts of his debtor by preventing purchases or sales above specified amounts does not thereby become a principal. However, if he takes over the management of the debtor's business either in person or through an agent, and d i r e c t s what contracts may or may not be made, he becomes a principal, liable as any principal for the obligations incurred thereafter in the normal course of business by the debtor who has now become his general agent. The point at which the creditor becomes a principal is that at which he assumes de facto control over the conduct of his debtor, whatever the terms of the formal contract with his debtor may be."

Our search is for evidence which will support a finding of mutual agreement for control sufficiently comprehensive in scope to include the buying activities of Boedeker.

██ ██ Viewing the evidence in the light most favorable to plaintiffs, as by settled principles of review we are bound to do, we read from it this background of fact. Nash-Finch Company had a dual interest in Boedeker's market. Because it was then convinced there was a possibility of developing a flourishing retail outlet for its wholesale wares, it made a not inconsiderable investment in the described market. To serve this interest, it brought to the aid of Mr. Boedeker men from its retail service division deemed to be skilled in sales, promotion and advertising. These men made their experience available to Boedeker through regular visitations and consultations. On the other hand, having acquired a $50,000 mortgage lien upon the stock and fixtures employed in the business, Nash-Finch was also interested in preserving and protecting its security. This interest it sought to serve

through Merchants Finance and Mr. Hanson. To the end that he might be constantly and reliably informed, Mr. Hanson insisted from the outset that Boedeker's accountancy be done by a Nash-Finch employee and that he be supplied with weekly reports of operations and periodical financial statements. When it became evident that a satisfactory volume of sales was not being developed and maintained the company intensified its efforts. Through its retail service division it sought in a number of ways, which need not be described, to assist Boedeker in promoting sales. On the other hand through Mr. Hanson, using the leverage which was provided by the above described demand obligations, it sought to accumulate such controls of Boedeker's operations as would assure it that neither cash nor merchandise could be withdrawn from the business. Early in 1957 there was insistence that the accountant countersign all checks. Eventually Parshall was injected into the business. Although the evidence is in conflict as to the understanding between Hanson and Boedeker when Parshall was employed, his actual activity in the business, and the extent to which Boedeker yielded to his control is not in dispute. Boedeker testified he was not introduced as the store manager. He took charge of the produce department; he raised the salary of three employees; when he caught Boedeker's stepson in dishonesty, he reported to Hanson and on his advice discharged the young man; he made other reports to Hanson; he counted the cash and made most of the deposits; he changed the locks and prevented access at off hours to any but Boedeker and himself, and he required everyone including Boedeker to go through the check-out lanes in withdrawing merchandise from the store. Otherwise the record is silent as to his activities. Other than the ordering he did as head of the produce department, there is no evidence that he participated in any manner in stocking the store or in issuing checks in payment for stock. Although Boedeker's purchases were feeding a $6,000 and up weekly turnover of merchandise, it is particularly noticeable that during this period of crisis, when Nash-Finch men were searching for every weakness in operations and seeking a means of streng-

thening the store's public relations, the only hint of criticism of Boedeker as a buyer touched upon the proportion of his purchases from Nash-Finch Competitors. It was then recognized by everyone that to change that proportion would require a grant of credit by Nash-Finch which it was then unwilling to extend. The record is utterly silent as to any attempt by Nash-Finch through Hanson or otherwise directly or indirectly to supervise or control Boedeker's buying operations. Although Boedeker was paying out thousands of dollars to other wholesalers, Hanson's only exercised control of those payments was through a refusal of his accountant to countersign checks when deposits were insufficient to assure honoring of such checks upon presentation. When all of these circumstances are viewed in the light of the testimony of Boedeker, offered by plaintiff, as to the limited authority he understood Parshall was to exercise, they impel conclusion that the clear preponderance of the evidence is against the finding of an implied mutual agreement that Boedeker would act under the control and supervision of Nash-Finch Company in his purchases of merchandise. As we have indicated we deem the manifestation of such a mutual agreement essential to the existence of the relation upon which the asserted liability of Nash-Finch must rest.

The above mentioned decision of F. A. Patrick & Co. v. Grand Forks Mercantile Co., 13 N.D. 12, 99 N.W. 55, is urged upon us. Because therein the mortgage debtor acted under an express contract which authorized him to act for the mortgage creditor not only in making sales from stock but in contracting replenishing purchases, we have found it of little help. A similar matter was before the Ohio court in Kelly v. Tracy & Avery Co., 71 Ohio St. 220, 73 N.E. 455. Although the contract there under consideration expressly authorized the debtor to represent the creditor in making sales, and provided that replenishing merchandise would come within the coverage of the mortgage, the court refused to uphold a finding that the debtor was authorized to act for the creditor in making replenishing purchases. And in the other cases which have come to our attention the courts have not hesitated in holding evi-

dence of broad measures of control by a creditor insufficient to sustain a finding that the debtor was authorized to contract on behalf of the creditor as an undisclosed principal. Commercial Credit Co. v. L. A. Benson Co., 170 Md. 270, 184 A. 236; Wasilowski v. Park Bridge Corporation, 2 Cir., 156 F.2d 612; and Waldie v. Steers Sand & Gravel Corporation, 2 Cir., 151 F.2d 129.

Having concluded that the central finding of the trial court is against the clear preponderance of the evidence, it follows that the above entitled judgments must be and they are reversed.

ROBERTS, P. J., and RENTTO and BIEGELMEIER, JJ., concur.

HANSON, J., dissents.